UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA SALSER, ET. AL.,

      Plaintiffs,

v.

DYNCORP INTL. INC., ET. AL.,

      Defendants.

_____/

Case No. 12-10960

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
R. STEVEN WHALEN

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [180]**

Plaintiffs filed suit against Defendants on March 2, 2012 [1]. Defendants filed a Motion for Summary Judgment [180] on August 5, 2015. Plaintiffs responded on January 9, 2016 [230] and Defendants replied on February 12, 2016 [240]. A motion hearing was held on this pending motion on March 2, 2016. For the reasons stated below, Defendants' Motion for Summary Judgment [180] is **GRANTED IN PART** and **DENIED IN PART.**

1

# FACTUAL BACKGROUND[1]

Justin Pope (Justin) was an employee of Dyncorp International LLC (DI) when he was shot and subsequently died as a result of a gunshot wound while on the compound in Erbil, Iraq on March 5, 2009.[2] Following his death, it is undisputed that Defendant Mike Boffo (Boffo) learned that the death was the result of the actions of Defendant Kyle Palmer, who killed him with a gunshot to the head while drunk and surrounded by witnesses [232, Exhibit 75].[3] Boffo, (Project Manager in charge of the entire Erbil compound), spoke with Defendant Mike Kehoe (Kehoe) (Boffo's second in command) immediately after the shooting, and told him to contact Defendant Patrick Dobson (Dobson) (the Program Manager in charge of all of DI's interests in Iraq). At the time, Kehoe was on leave from Iraq, and was located in Jacksonville, NC [180, Exhibit 20]. Dobson was in Virginia at the time of the incident and was also not present in Iraq during the incident [230 at 18, note 67].

---

[1] Since several Defendants have been dismissed from the case, the Court will only consider the factual allegations that concern the conduct of those Defendants still remaining in the case.

[2] The Defendant Dyncorp Intl. Inc. (DI Inc.) is a holding company that does not have employees [180, Exhibits 4, 19, 20, 34].

[3] In a prior lawsuit, the death of Justin Pope was found to be accidental. A judicial determination was made that "there is no genuine dispute that Pope's death" was "accidental," occurring "due to the interaction between Pope and Palmer while Palmer was intoxicated." *Pope v. Palmer*, No. 10-13285, 2011 WL 4502859, at *1 (E.D. Mich. Sept. 28, 2011).

Boffo went to the room where Justin was within minutes after learning that Justin had been shot, before the State Department investigators arrived [232, Exhibit 71]. Boffo and the other men present began to clear the room of the evidence that alcohol had been consumed, as bottles were stuffed into plastic bags and dumped into trash cans [231, Exhibit 3 at 135].[4]

Dobson informed Kehoe that there had been an accident on the compound. After receiving this report, Kehoe called the compound to obtain further details [120, Exhibit 20]. He spoke with the operations chief of the compound, Joe Shimizu, who informed him that Justin Pope had accidentally discharged his weapon. *Id*. Dobson called Justin's family and informed Plaintiff Ashley Pope (Justin's wife), that Justin had been shot in the neck [230 at 23]. He later called back and told her that Justin had died. *Id*.

---

[4] Dyncorp instituted a no drugs or alcohol policy following the Blackwater massacre. Plaintiffs allege that the lies surrounding the death of Justin that comprise their legal claims were made to conceal the rampant and continued violation of company policy banning alcohol, in an attempt to avoid loss of their lucrative contracts with the State Department, which had power to terminate the contract if "[t]he Contractor failed to comply with any material requirement of this contract," which included a prohibition of "careless or irresponsible behavior." Following an investigation of Justin's death by the State Department, DI was ordered to fire Boffo and everyone present in the room when Justin was shot [223, Exhibit 52], and in 2010, refused to renew its multibillion dollar contract in Iraq because of concerns about "oversight of its own personnel," referencing Justin's death [232 at Exhibit 66].

Kehoe testified that on the trip to Detroit to meet with Justin's family, Dobson told him that the wound that killed Justin appeared to be self-inflicted, that alcohol appeared to be involved in the incident, and that there was an ongoing federal investigation [231, Exhibit 38 at 82-84]. Dobson denies telling Kehoe that the wound was self-inflicted, and Boffo denies knowing that Justin's family was being told a story that the wound was self-inflicted [230, Exhibit 45 at 123; Exhibit 24 at 194-99, 200, 390-91].

When Kehoe arrived, he met with the family of Justin and informed them that the wound was self-inflicted. According to Heather Pope, a witness to these statements, Kehoe stated that Justin was alone in his room at the time [230, Exhibit 5 at 30, 33, 41, 47, 68-69].

The next contact of Plaintiffs had with Defendants concerning Justin's death took place on March 8, 2009, when Palmer arrived in Michigan to attend the funeral with other witnesses of the event [230, Exhibit 36]. Palmer told Ashley Pope that he was present when Justin died; that "they were screwing around;" that both his hands and Justin's hands were on the gun at some point, but that he could not remember the moment of Justin's death because he had gone into "convulsions" and "blacked out."

4

On April 9, 2009, Mike Boffo and his wife visited Justin's parents and Ashley in Michigan. Neither of the Boffos corrected any possible mistaken assumption that Justin's family may have had concerning his death. Also on April 9, Palmer went to a bar with Justin's siblings and Ashley, but Palmer told them he could not talk about the incident because he was under investigation.

Additionally, from the time of the death of Justin Pope, there have been accounts of the accident relayed in internal investigations of the incident and internal emails that contradict the fact that Palmer accidently shot Justin Pope. These include reports to the U.S. Department of Labor submitted on March 5 by DI which state that "Pope accidentally discharged his weapon causing a round to strike him in the head" [230, Exhibit 25]. An official account of the accident prepared on March 5 by Defendant Boffo also states that: "Employee [Justin] accidentally discharged the weapon causing a round to strike him in the head." [230, Exhibit 27].

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party

5

has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must construe the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### ANALYSIS

#### 1. DEFENDANT DYNCORP INTL. INC.

Plaintiffs seek to hold Defendant DI Inc. liable for the actions of the individually named Defendants, who are alleged to have been acting within the scope of their employment as Dyncorp agents and employees during all pertinent times [3 at ¶19-20]. It is undisputed that DI employed the individually named Defendants in this case rather than DI Inc. [180, Exhibits 4, 19, 20, 34].

As an initial matter, DI Inc. should be dismissed from the case as a matter of law. According to an affidavit presented by Elvira French, the Assistant Corporate Secretary for DynCorp Intl. LLC (DI), Dyncorp Intl. Inc. does not, and never has

6

had, any employees [180, Exhibit 34]. Plaintiffs do not dispute this assertion in their response.

Under Michigan law, "[a] corporation can only act through its employees and, consequently, the acts of its employees, within the scope of their employment, constitute the acts of the corporation." *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 213 (1991). "An employer is liable only for the acts of its employee committed within the scope of employment." *Linebaugh v. Sheraton Michigan Corp.*, 198 Mich. App. 335, 343, 497 N.W.2d 585, 589 (1993) (internal citations omitted). Additionally, Michigan Courts recognize that "separate corporate entities will be respected…[and] absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities." *Seasword v. Hilti, Inc.*, 449 Mich. 542, 547 (1995). If Plaintiffs were successfully to claim tort liability against DynCorp Intl. Inc., they would have had to have pled either some abuse of corporate form, or have alleged "(1) the existence of a parent-subsidiary relationship, and (2) facts that justify piercing the corporate veil." *Id* at 548-49. These facts or allegations must establish that the Defendant "abused their presumably separate and distinct corporate forms." *Id*.

Plaintiffs argue that a "fact specific inquiry into the corporate separateness and/or corporate integration is required," and allege that Defendants did not

7

provide notice that they would seek dismissal of one of the Defendants. However, Defendants produced an email between Defendants' Counsel and Plaintiffs' Counsel on January 2, 2015 that includes a facilitation summary stating that DI Inc. "is a holding company and has no employees…[a]s such, DynCorp International, Inc. will be dismissed form this lawsuit during the Summary Judgment phase." [240, Exhibit 1].

At the Motion hearing, Plaintiffs presented a new argument in favor of not dismissing Defendant Dyncorp Intl. Plaintiffs rely upon the case *Pope v. Palmer* to support the proposition that DynCorp Intl. Inc. and Dyncorp LLC are not distinct entities, and therefore both are considered as employers of Justin Pope and the various named Defendants. *See* 2011 WL 4502859 at *7. This argument was never briefed and Defendants did not have opportunity to respond. Moreover, as stated above, it has been an established fact in this case that Defendants would seek dismissal of Dyncorp Intl. Inc. based on the argument that it has no employees and that Plaintiff has never sought discovery seeking information that would be required to complete the fact specific inquiry they state is required as antecedent to dismissal of DI Inc.

Plaintiff also failed to present any facts or allegations surrounding DI Inc. to show that they are not separate entities in their response brief. Thus, Plaintiff has

failed to state a valid claim against DI Inc. Pursuant to 28 U.S.C. § 1915(e)(2)(B), DI Inc. is dismissed.

### 2. IIED CLAIMS

#### a. LEGAL STANDARD

The Supreme Court of Michigan has not officially recognized the tort of IIED. However, the Court of Appeals has ruled on claims of IIED. See e.g. *Michigan Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980); *Lucas v. Awaad*, 299 Mich. App. 345, 359 (2013). "To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff.' " *Dalley v. Dykema Gossett PLLC*, 287 Mich.App. 296, 321, 788 N.W.2d 679 (2010) (citation omitted).

"Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 212 Mich.App. 73, 91, 536 N.W.2d 824 (1995). Accordingly, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions,

9

or other trivialities." *Id*. To qualify as outrageous behavior, and constitute a valid IIED claim, the behavior alleged must be the type that would lead a person to exclaim "outrageous!" *Garretson v. City of Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005) [citation omitted].

The majority of the facts presented by Plaintiffs concerning the conduct at issue in the IIED claims do not involve conduct aimed directly at Plaintiffs, as is contemplated by the test for a direct claim of IIED. Rather, the conduct is aimed a third party, in this case the Department of State, since the Plaintiffs allege that the misstatement of the true cause of Justin's death, and the subsequent alleged outrageous conduct underpinning the IIED claims, was committed with the intent of covering up DI's flagrant and continual violations of its drugs and alcohol policy from the State Department to keep its lucrative contracts.

Defendants argue that these "bystander" claims cannot survive summary judgment; because Plaintiffs were not present at the time the conduct was directed at the Department of State. They cite the Second Restatement of Torts, which limits bystander IIED claims to conduct "directed at a third person" when the actor may know that it is "substantially certain, or at least highly probable, that it will cause severe emotional distress to Plaintiff," and the Plaintiffs are present at the time the conduct is directed at the third party; thus limiting liability to those

present at the time of the outrageous acts "as distinguished from those who discover later what has occurred." Restatement (Second) of Torts § 46 (1965).

Under this standard, all claims of IIED based on facts that do not include conduct directed at the Plaintiffs by Defendants, and conduct directed at the Department of State and other parties for which Plaintiffs were not present to witness, would be subject to summary judgment. As the Defendants point out, the Michigan Courts adopted this definition of IIED in 1985, citing the Second Restatement of Torts, and have applied this definition of IIED for many years. *See Roberts v. Auto-Owners Ins. Co*., 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985); *see also Tyler v. Huron Valley Sinai Hosp*., No. 264267, 2006 WL 740168, at *4 (Mich. Ct. App. Mar. 23, 2006); *Hayes v. Langford*, No. 280049, 2008 WL 5158896, at *5 (Mich. Ct. App. Dec. 9, 2008).

Plaintiffs argue that outrageous conduct directed at third parties, outside of the presence of Plaintiffs, can constitute IIED. However, the cases they cite do not support a valid claim of IIED in factual scenarios similar to Plaintiffs. Thus, Plaintiffs rely upon *Barnes v. Double Seal Glass Co*. for the proposition that outrageous statements about a Plaintiff's deceased family member directed at third parties, and without any direct communication with Plaintiffs state a valid claim for IIED. 129 Mich. App. 66 (1983). However, this case did not resolve the merits

11

of the IIED claim; rather the Court only determined that the exclusivity provisions of the Wrongful Death and Worker's Disability Compensation Acts did not bar an IIED claim. *Id*. This case therefore has no bearing on the pending Motion for Summary Judgment.

Plaintiffs cite three cases for the proposition that the totality of the circumstances of each case must be examined to determine whether there is a valid IIED claim, and that therefore the fact that conduct was directed at third parties, without direct communication with Plaintiffs, does not require dismissal of their claims. *Mroz v. Lee*, 5 F.3d 1016 (6th Cir. 1993); *Ellis v. Dykema Gossett PLLC*, No. 301131, 2013 WL 3717799 (Mich. Ct. App. July 16, 2013); *Armstrong v. Shirvell*, 596 F. App'x 433 (6th Cir.) cert. denied, 136 S. Ct. 403, 193 L. Ed. 2d 315 (2015). In each case, while not all of the conduct occurred in the presence of the Plaintiffs, they felt its effects contemporaneously.

For example, in *Ellis*, Defendant's outrageous conduct, including filing suit against him and seeking to make a case to get him fired in order to keep his book of business. *Supra*. These actions were not done in the presence of the Plaintiff, he contemporaneously felt their effects. In *Mroz*, Plaintiffs "directly threatened the safety of Plaintiff and Plaintiff's family," *supra*. Plaintiff immediately learned of these threats made outside of his presence and experienced emotional distress.

12

Finally, *Armstrong*, follows a similar pattern to *Mroz* and *Ellis*. Defendants engaged in continual harassment of Plaintiff, of which he was aware since Plaintiff sought protection and assistance from the police. *Supra*.

*Ellis* and *Armstrong* cite the Third Restatement of Torts definition of IIED. Under this conception of bystander liability, direct contact is no longer needed and when outrageous activity is directed at other individuals, liability can attach when "the person seeking recovery contemporaneously perceived the event, as distinguished from those who discovered what has occurred later." Restatement (Third) of Torts: Phys. & Emot. Harm § 46, comment m (2012). This is the standard that will be used to analyze all IIED claims for allegations that are not directed at Plaintiffs given that the Third Restatement is the most recent iteration.

### a. WITHHOLDING INFORMATION DOES NOT CONSTITUTE IIED

#### i. WITHHELD INFORMATION IS PROTECTED FROM IIED LIABILITY BY A LEGITIMATE BUSINESS PURPOSE

Defendants argue further that, to the extent that the IIED claim is based on the withholding of information concerning Justin's death, the conduct alleged to constitute IIED is protected by a legitimate business purpose; *viz,* they were acting pursuant to a term within their contract with the Department of State that prohibited disclosure of information unless authorized:

> [Defendants] shall not communicate to any person any information known to them by reason of their performance of services under this contract, which has not been made public except in the necessary performance of their duties or upon written authorization of the Contracting Officer.

Therefore, the lack of complete transparency in their statements cannot be held against them, because they had a legitimate business purpose to withhold information. *See Ross v. DynCorp*, 362 F. Supp. 2d 344,350 (D.D.C. 2005). This rule is analogous to one in Michigan law, which provides:

> [a]n actor is not liable for [IIED] where he has done no more than insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional distress.

*Butt v. Detroit Auto. Inter-Ins. Exch.*, 129 Mich. App. 211, 219, 341 N.W.2d 474, 478 (1983).

However, as Plaintiffs point out, this assertion is tenuous at best, since they allege that the withholding of information was *not* done as a result of this provision, but rather in an attempt to conceal illegal conduct under this very same contract – violation of the no drugs and alcohol policy. Additionally, in contrast to *Ross*, the incident did not occur while the deceased was performing services under the contract; rather Justin's death took place while those involved were in fact *violating* the contract, and off-duty. Therefore applicable factual omissions involved in the IIED claim will be considered in the analysis.

14

### ii. WITHHOLDING INFORMATION IS NOT OUTRAGEOUS AS A MATTER OF LAW

Defendants argue that withholding information is not outrageous as a matter of law. While this may be true when only omissions are alleged, when considering an IIED claim, the Court must consider the totality of circumstances, and in this case, omissions and statements are alleged and must be considered in support of each claim. *See e.g. Mroz v. Lee*, 5 F.3d 1016, 1019-20 (6th Cir. 1993); Restatement (Third) of Torts: Phys. & Emot. Harm § 46 (2012).

### b. DIRECT AND BYSTANDER IIED CLAIMS AGAINST DEFENDANT DOBSON

Defendant Dobson communicated directly with Plaintiffs Ashley Pope and Kevin Pope, Jr. concerning the death of Justin. Additionally, Dobson relayed to Kehoe, while on his way to Detroit to meet with the family in person. This indirect conduct was aimed at Plaintiffs and was contemporaneously felt by them. According to Kehoe's deposition, Dobson informed Kehoe that Justin's gunshot wound was self-inflicted [230, Exhibit 38 at 83-86, 162, 179-180, 183, 184. Ex.49]. Dobson denies ever telling Kehoe that the wound was self-inflicted, stating that he "would never have told him [Kehoe] it was a self-inflicted injury." [230, Exhibit 45 at 123].

Plaintiffs seek to infer Dobson's knowledge of the truth because Boffo has admitted he told Kehoe to contact Dobson and inform him of the situation after the shooting occurred [230 at 18 nt 67]. However, there is no indication in the record that Boffo told Kehoe that Palmer had shot Justin, or that he was involved in the shooting in any way.

Dobson was not present in Iraq, and received second hand information concerning the incident. When he called Justin's family, he told them that Justin had been shot; still later, he informed them that he had died. There is no indication that these were lies, or that he was reckless in making his statements because they might cause Plaintiffs emotional distress. He was merely relaying information that he had received from those on the ground in Iraq. There is no evidence presented, other than the fact that that his story matches that of Boffo's, who was present on the ground and knew that Palmer was involved in the shooting, that could support finding Dobson liable for IIED.

Additionally, even when the facts are taken in the light most favorable to the Plaintiff, and the Court accepts that Dobson informed Kehoe that the wound was self-inflicted, and only later changed his story, there is still no evidence to show that he had any knowledge about the truth of the accident. A reasonable jury, even considering the factual question of what was actually said about the cause of death,

16

could not conclude that he was reckless, causing emotional distress. There are simply no facts to show that Dobson had knowledge that Justin's wounds were not self-inflicted at the time he spoke with Kehoe.

Accordingly, summary judgment as to the IIED claims as related to Defendant Dobson is granted.

### c. BYSTANDER CLAIM AGAINST DEFENDANT BOFFO

It is undisputed that Boffo was aware that Palmer had shot Justin before Plaintiffs were informed of this fact. Additionally, Plaintiffs allege that Boffo spoke with Dobson and Kehoe immediately following the incident, who then followed with immediate contact with Plaintiffs concerning the death of Justin. Plaintiffs further allege that Boffo took time to clear the scene of the incident of any evidence of alcohol, and also encouraged the witnesses to downplay its presence or role in the tragedy.

There is evidence to support the allegation that Boffo knew that Justin was shot by Palmer, but that he continued to support a story that the gunshot wound was self-inflicted, including signing and creating an incident report that described the injury, but failed to include the fact that that Palmer shot Justin. This report, and other internal and official accounts of the incident created and circulated

17

within DynCorp by Boffo, matches the false story that Kehoe and Dobson were telling Plaintiffs concerning a self-inflicted wound.

It would be reasonable for a jury to conclude that Boffo, who was in charge on the ground in Iraq and knew the truth about Palmer shooting Justin immediately perpetuated a story that the wound was self-inflicted, acted recklessly when he created and spread the story that Justin's wounds were self-inflicted; and that his contact with those who informed Plaintiff of the cause of death was contemporaneous to the Plaintiff's emotional distress, qualifying as a valid bystander IIED claim. Additionally, a jury could conclude that being told conflicting stories about the circumstances surrounding the death of your son, husband, and father, including facts suggesting the wounds were self-inflicted, would be considered outrageous and could reasonably be expected to cause emotional distress.

Therefore, summary judgment as to IIED claims against Defendant Boffo is denied. Given that the complaint alleges that his actions were taken in the scope of his employment, summary judgment as to IIED claims against Dyncorp LLC, who was undisputedly Boffo's employer when the alleged activity took place, is also denied and they remain a party in the case in relation to this remaining claim.

18

### d.  DIRECT IIED CLAIM AGAINST DEFENDANT KEHOE

Similar to Dobson, Kehoe was not present in Iraq and did not have firsthand knowledge of the attack. He travelled to Detroit and informed the family what he had been told by Dobson, that the death was caused by a self-inflicted gunshot wound to the head and, according to Plaintiffs, further that Justin was alone at the time. This information is consistent with the report circulating at the time that the death was due to an accidental firearm discharge.

While Plaintiffs assert that they concluded Kehoe was suggesting that Justin killed himself, he was actually reporting the facts he believed to be the true at that time, and this is not outrageous behavior. Kehoe was reporting information that he learned from Dobson, who was in charge of the Iraq operations, based in Virginia. Neither had firsthand knowledge of the incident, nor have Plaintiffs presented any information indicating knowledge of the true cause of death before they made their statements.

The fact that Kehoe and Dobson's stories are congruent is not proof that Kehoe knew the truth or acted recklessly by telling Plaintiffs that the wounds were self-inflicted. Absent any evidence that they knew the truth, Kehoe was merely reporting what he believed to be the truth, as relayed by Dobson. Plaintiffs attempt to impute ill-will on the part of Kehoe to support their allegation that Kehoe was

reckless in causing IIED to Plaintiffs through the introduction of crude and insensitive comments about the Plaintiffs and Justin in internal reports of the visit to Justin's family. While unpleasant, these reports and conversations did not contemporaneously reach the Plaintiffs and thus have no impact on their pending IIED claims. Moreover, there is no evidence in the record showing that his behavior, while in contact with the Plaintiffs, was outrageous.

Therefore, summary judgment as to the IIED claims relating to Kehoe is granted.

### e.  DIRECT CLAIM AGAINST DEFENDANT PALMER

As stated above in the factual summary, Palmer met with Ashley Pope and told her that he was present when Justin died; that "they were screwing around;" that both his hands and Justin's hands were on the gun at some point, but that he could not remember the moment of Justin's death because he was having "convulsions" and "blacked out." This report is consistent with an accidental death, which is what the Court in *Pope v. Palmer*, No. 10-13285, 2011 WL 4502859, at *1 (E.D. Mich. Sept. 28, 2011) found. As a matter of law, truthful statements cannot be outrageous. *Andrews v. Prudential Sec., Inc.*, 160 F.3d 304, 309-10 (6th Cir. 1998).

While Palmer's statement that he had convulsions and blacked out are, at least, possibly partially untrue, since he fled the room after Justin was shot, this inconsistency does not meet the high standard required of being outrageous, therefore summary judgment is granted as to the IIED claims against Defendant Palmer.

### 3.  CONSPIRACY TO COMMIT IIED

#### a.  INTRA-CORPORATE CONSPIRACY DOCTRINE

In their amended complaint, Plaintiffs allege that "at all pertinent times herein, the individual named Defendants were acting within the scope of their employment as DynCorp agents and employees," and further that "Dyncorp set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, authorized, confirmed, ratified, and/or conspired with others to inflict emotional distress on Plaintiffs." [3 at ¶20].

Under Michigan law, a conspiracy is defined as "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Fenestra Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593, 141 N.W.2d 36, 48 (1966). The Intra-Corporate Conspiracy doctrine provides that, since a conspiracy requires more than two people, "[a] corporation cannot conspire with itself any

21

more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

The Sixth Circuit adopted this general rule for civil conspiracies in *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir.1984). *See also Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991); *Amadasu v. The Christ Hosp.*, 514 F 3d 504, 507 (6th Cir. 2008). Michigan Courts have followed suit, and have held that, when Defendants are acting within the scope of their employment, there can be no "civil conspiracy between a corporation and its agents acting within the scope of their employment." *Tropf v. Holzman & Holzman*, No. 257019, 2006 WL 120377, at *1-2 (Mich. Ct. App. Jan. 17, 2006).

Plaintiffs' complaint clearly asserts that Defendants are acting as agents/within the scope of their employment "at all pertinent times." Plaintiffs' response fails to provide an elaborated reply to the argument for summary judgment as to the conspiracy claim. Instead, they attempt to remedy this in their response, stating that the "conspiracy claim is limited to concerted action between DynCorp and non-employees," as determined during discovery. Prior to the

22

Motion for Summary Judgment, Plaintiffs did not file any motion to amend their complaint. They now seek to rely upon statements within their response to repair a pleading problem. Plaintiffs "cannot bring new legal theories for recovery in a summary judgment motion." *Imhoff Inv., LLC v. SamMichaels, Inc.*, No. 10-10996, 2014 WL 172234, at *5 (E.D. Mich. Jan. 15, 2014) (citing *Jocham v. Tuscola Cnty,* 239 F.Supp.2d 714, 732 (E.D.Mich.2004) (rejecting attempt to change factual allegations to support new claim).

Moreover, the ex-employees at issue were fired on April 2, 2009 per evidence provided in Plaintiffs' response [232, Exhibit 52]. Plaintiffs allege in their pleadings that the agreement took place while they were still employed, and in fact that the alleged cover-up agreement commenced less than 24 hours after the shooting of Justin in Iraq. Therefore, their new assertion that they are limiting their conspiracy claim to action between DynCorp and non-employees does not track with their factual arguments concerning the alleged conspiracy, since the conspiracy is alleged to have commenced a month before those Defendants were terminated [3 at ¶38].

Accordingly, summary judgment is granted as to the conspiracy to commit IIED claim against all Defendants.

### 4. **DEFENDANT IGO IS DISMISSED**

Per Court order, Defendant Igo was served by substituted service, effectuated by serving the attorney who entered an appearance on behalf of DynCorp (i.e. Secret Wardle representative) [29]. This representative answered on behalf of Igo (and several other Defendants who have been dismissed via a stipulated order on October 26, 2012) [37]. Plaintiffs requested a clerk's entry of default judgment as to Igo on March 24, 2014, but it was denied because of the answer filed in 2012 [67; 68]. There is no evidence that Plaintiffs have pursued any further attempt to obtain the appearance of Defendant Igo since their attempt to obtain a default judgment against him.

Plaintiffs argue that Igo is not a moving-party, and that Defendants cannot include him as a moving party on their Motion for Summary Judgment because he is not represented by Counsel, and has not appeared. Defendants aver that Igo has never been personally served, and to the extent that he is a Defendant, he should be dismissed from the case because he never had any communication with any of the Plaintiffs.

It is undisputed that Igo was an employee of DI when Justin was killed, and thus, similar to all other Defendants, there is not a valid claim for conspiracy to commit IIED because of the Intra-Corporate Conspiracy Doctrine. As to the IIED

claim, the depositions provided by the Plaintiffs show that there was no contact between themselves and Igo. The only involvement that Igo had in the accident was as a witness in the room at the time of the shooting. There is no conduct contemporaneously impacting Plaintiffs that could sustain a bystander IIED claim and the conspiracy to commit IIED claim has been granted summary judgment in favor of the Defendants. Therefore, Defendant Igo is dismissed from this case.

### CONCLUSION

In conclusion, summary judgment is granted to all Defendants as to the conspiracy to commit IIED claims and the IIED claims against Defendants Dobson, Palmer and Kehoe. Additionally, Defendant Dyncorp Intl. Inc. and Defendant Igo are dismissed from the case. Summary Judgment is denied as to the IIED claims against Defendant Boffo. The remaining parties before the Court in this case are Defendant Boffo and Defendant Dyncorp LLC.

**IT IS ORDERED** that Summary Judgment [230] is **GRANTED** as to the Conspiracy to Commit IIED claim against all Defendants and the IIED claims against Defendants Dobson, Palmer and Kehoe.

**IT IS FURTHER ORDERED** that Summary Judgment [230] is **DENIED** as to the IIED claim against Defendant Boffo and Defendant Dyncorp LLC.

**IT IS FURTHER ORDERED** that Defendants Dyncorp Intl. Inc., Corey Igo, Michael Kehoe, Kyle Palmer and Patrick Dobson are dismissed from the case.

**SO ORDERED**.


s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: March 16, 2016          Senior United States District Judge